BLACKSTOCK DRILLING CO. v. R. OLSEN OIL CO.

Civ. No. 3566.

District Court, W. D. Oklahoma.

July 23, 1947.

Luther Bohannon (of Bohannon & Adams), of Oklahoma City, Okl., for plaintiff.

T. Murray Robinson (of Robinson, Shipp & Robertson), of Oklahoma City, Okl., for defendant.

VAUGHT, District Judge.

The plaintiff seeks to recover for services rendered to the defendant in accordance with the terms of a written contract entered into on August 6, 1946, for the drilling of a well in Major County, Oklahoma.

The contract provided that the contractor (plaintiff herein) should be paid $8.50 per foot of hole drilled, which should constitute full payment for all work and labor done in drilling and casing the well and all equipment, supplies, and services furnished by the contractor except as elsewhere specifically provided. Paragraph II(b) provided that the contractor should do all cleaning out, plugging back, coring, and testing, and any other nonfootage-rate work in connection with the drilling and

completing of said well that was requested by the defendant, and that the defendant should have the right to delay contractor's drilling operations, in order to have made any well surveys or studies that the defendant wished made, and that the defendant should pay the contractor for such delays and for the time necessary to do all such work at the rate of $500 per day of 24 hours when drill pipe was not in use and $600 per day of 24 hours when drill pipe was in use. Paragraph IV provided that the contractor should "furnish complete rotary drilling outfit or outfits of good quality, including derrick, and all necessary tools and equipment, including blowout preventer or preventers, if necessary, suitable and essential for drilling of wells of this type and depth," and should also furnish the necessary cellar and pits, fuel and water, and all labor, including necessary supervision, required to drill and complete the well according to the provisions of the contract. Do such coring as the defendant requested and furnish all material and equipment for such coring at the contractor's expense, except coreheads, which the defendant agreed to furnish, and the contractor should allow without any charge to the defendant, the time necessary for defendant to have cemented in a manner satisfactory to it any string of casing that the defendant wished cemented in said well, and the contractor should make no charge for any shut-down time while waiting for cement to set. The contractor would make and furnish daily to the defendant on forms to be furnished by the defendant, a report of progress made and work done each day, indicating actual formations drilled and points at which casing was set, and in case of shutdown, the reason therefor in detail and, when requested by the defendant, a record of drilling time. The contractor assumed all liability and would indemnify the defendant "against any liability for injuries or damages to contractor's employees, or to any other person, persons or property, incident to or resulting from the operations of the contractor hereinunder." There then were other provisions in the contract ordinarily made in contracts of this character. Paragraph VIII provided that the defendant should furnish all necessary mud, chemicals and other materials used in plugging off in the event circulation was lost and also should pay for cementing services. "Should circulation of mud or fluid be lost for more than 24 hours in any one instance," the defendant should pay the contractor "on a daywork basis for work performed, except for standby operations while cement is setting, which would be at the rate of $300 per 24 hours instead of the regular daywork rate."

The interpretation of the last section of the contract quoted constitutes the basis of this suit, and the court is required to define "circulation" and "lost circulation," and to determine expressly what was intended by "should circulation of mud or fluid be lost for more than 24 hours in any one instance, Olsen shall pay the contractor on a daywork basis for work performed."

In drilling a well with rotary equipment, the drilling cone is attached to the bottom of what is known as the drill pipe. The drill pipe is hollow and mud of a liquid character is pumped into the top of the drill pipe and forced down through the pipe to the cutting cone. The purpose being to eliminate the material, whether dirt, rock or other material, which is actually cut by the cone, and to force said material, so cut, back through the hole on the outside of the drill pipe. The mud so returning on the outside of the drill pipe flows out of the top of the hole and back into the mud basin. If there be no loss of mud in the hole, more mud would flow out of the hole than goes into it for the reason that all of the cuttings made by the drill are forced out through the mud. Some of the mud would attach to the walls of the hole where casing had not been set, but ordinarily only a small portion of the mud would be so lost. In drilling in porous structures where there are openings leading off from the hole, frequently much, and sometimes all, of the mud is lost by being forced into these cavities. By circulation, therefore, is meant mud going into the hole through the drill pipe and coming out of the hole outside of the drill pipe. This would be a continuous movement of the mud and would constitute circulation. Mud forced into the hole through the drill pipe performs two

functions. First, it eliminates cuttings made by the drill and, second, it keeps the structure moist through which the drill is penetrating and into which it is cutting. But if this mud, which is forced into the pipe, is eliminated by penetrating the porous structure through which the hole is drilled, then it could be said that circulation was interfered with or lost. Lost circulation, therefore, would mean any interruption of the return of the mud forced into the hole which would prevent its flowing out of the hole in substantially the same quantity that was forced into the hole. There might be a partial interruption of circulation, or there might be complete interference with the circulation, so that no mud would return to the surface. However, any interference with the circulation which would prevent the elimination of the cuttings at the bottom of the hole and the proper conditioning of the structure into which the drill was cutting, could be termed lost circulation.

■ The section of the contract above quoted provides that if the circulation be lost for more than 24 hours in any one instance, the defendant should pay the contractor on a daywork basis for work performed. It is the contention of the plaintiff that if loss of circulation continued for more than 24 hours, the plaintiff should be paid for work for that entire period, but if the loss of circulation was for a less period than 24 hours, then the plaintiff should not be paid for the work done. On the other hand, the defendant contends that it would be entitled to loss of circulation for 24 hours in any one instance without any obligation to pay the plaintiff for work done. In other words, if loss of circulation was for 30 hours, the defendant would be liable for only the difference between 24 and 30 hours, or 6 hours, but if the loss of circulation was for 23 hours then the plaintiff would not be paid for the work done.

A similar clause to the clause quoted has not been construed by any court so far as this court can determine. The attorneys, though requested by the court to furnish authorities on this point, have not submitted any cases construing a similar provision to this, and the court after diligent inquiry and investigation has been unable to find any such judicial construction. It is therefore necessary to determine this as a case of first impression.

The language of the contract is clear. "Should circulation of mud or fluid be lost for more than 24 hours in any one instance, Olsen shall pay the contractor on a daywork basis for work performed." The contract does not say that if circulation should be lost for more than 24 hours then the contractor should be paid on a daywork basis for the excess of 24 hours. It appears to the court, therefore, that the reasonable construction would be that if the loss is 24 hours or less there would be no obligation on the part of the defendant to pay for this lost time, or the work performed during that period, but if the loss was for more than 24 hours then the contractor should be entitled to pay for the work performed.

The loss of circulation means additional work for the contractor. It must prepare and have prepared additional quantities of mud and must include in the mud other materials such as cottonseed hulls and chemical preparations which would have a tendency to close up the openings in the wall of the hole through which the mud escapes, and frequently it requires a great quantity of mud in order to stop the leakage through the wall of the hole. If this loss of circulation continued for a much longer period than 24 hours, it would entail heavy additional work for the contractor, and it is the opinion of the court on this point that the contractor would be entitled to pay for the work done for the entire period if the period in which the lost circulation continued was more than 24 hours.

The plaintiff alleges that it is entitled to compensation for work done during the period when circulation was lost covering four distinct instances.

The first instance is from October 18 to and including October 21, 1946. The daily reports, which were introduced in evidence, show circulation was lost at 2 p.m. on October 18. This would be in what is known as the second tour, therefore, 10 hours were lost on the 18th. On the 19th, there was lost circulation for 24 hours. On the 20th, the plaintiff claims 16 hours of lost

circulation. However, the daily report shows that for the first tour there was lost circulation; that in the second tour, plaintiff conditioned mud for 4 hours and worked on repairs for 4 hours; and that in the third tour, plaintiff worked on the back motor. It appears, therefore, that the plaintiff would be entitled only to 12 hours instead of the 16 hours claimed on this date. On the 21st, the daily report shows in the first tour, "got circulation." The court, therefore, is of the opinion that the plaintiff would be entitled to 10 hours on the 18th, 24 hours on the 19th, 12 hours on the 20th, but that on the 21st, there is no indication on the daily report of lost circulation.

In the second instance, from November 2 to and including November 6, 1946, the daily reports show loss of circulation of 24 hours on the 2nd; 24 hours on the 3rd; 24 hours on the 4th; 24 hours on the 5th; and 8 hours on the 6th. It is true that in these daily reports a small amount of drilling footage is indicated of 5 feet, 2 feet, 9 feet and 3 feet, but it would be impossible to keep a drill pipe moving and not to make some footage.

In the third instance, from November 21 to and including November 25, 1946, the daily reports show that on the 21st, for the second and third tours there was loss of circulation of 16 hours; 24 hours on the 22nd; 24 hours on the 23rd; 24 hours on the 24th; and 24 hours on the 25th.

In the fourth instance, from December 15 to and including December 17, 1946, the daily reports show that the drill pipe stuck at 2 a.m. on the 15th and there was no circulation. The plaintiff claims that the lost circulation, amounting to 22 hours on the 15th, 24 hours on the 16th and 20 hours on the 17th, directly caused the drill pipe to stick in the hole, and that it was necessary for the plaintiff to purchase oil, force the oil to the bottom of the hole, saturate the drill, and loosen it in the rock structure. That may be true, but the contract provided for payment of time for loss of circulation, and the responsibility for preventing the drill pipe from becoming stuck in the hole, or loosening it, is the responsibility of the plaintiff. The court is of the opinion that this time was utilized in attempting to loosen the drill pipe, and that this condition might have existed even had there been circulation. Under the strict wording of the contract, the plaintiff would not be entitled to compensation under the fourth instance.

There is also a claim by the plaintiff for $618.65 for certain materials, including crude oil, transportation services, et cetera, all incident to the loosening of the drill pipe in the well. The court is of the opinion, therefore, that this item should be disallowed.

The court finds that plaintiff is entitled to time on account of lost circulation as follows:

| First instance: | October 18, 1946 | 10 hours | $ 250 |
| | " " 19, " | 24 " | 600 |
| | " " 20, " | 12 " | 300 |
| | | Total | $1,150 |
| Second instance: | November 2, 1946 | 24 hours | $ 600 |
| | " " 3, " | 24 " | 600 |
| | " " 4, " | 24 " | 600 |
| | " " 5, " | 24 " | 600 |
| | " " 6, " | 8 " | 200 |
| | | Total | $2,600 |
| Third instance: | November 21, 1946 | 16 hours | $ 400 |
| | " " 22, " | 24 " | 600 |
| | " " 23, " | 24 " | 600 |
| | " " 24, " | 24 " | 600 |
| | " " 25, " | 24 " | 600 |
| | | Total | $2,800 |

Under the fourth instance, the plaintiff is not entitled to its claim, nor to the item of $618.65, for material and equipment in removing the drill pipe when stuck in the hole.

It was admitted in open court that certain items covering the period from September 26 to and including December 30, 1946, amounting to $4,979.17, should be allowed the plaintiff, and since this amount is admitted the various items are not stated in detail in this opinion.

The evidence as to the item of $1,833.33 for work performed on the basis of $500 per day from December 31, 1946 to January 7, 1947, supports the plaintiff's claim for this amount. An additional item of $66.33, for building fences and clearing location, should be allowed.

362

The controverted claims are those under the four instances for lost circulation time.

The court therefore is of the opinion that the following items should be allowed the plaintiff: (1) $4,979.17; (2) $1,833.33; (3) $66.33; (4) $1,150, for time under first instance; (5) $2,600, for time under second instance; (6) $2,800, for time under third instance; or a total of $13,428.83.

The plaintiff agreed to the following credits to be allowed the defendant: (1) $1,037, for 122 feet drilled at $8.50 per foot, while plaintiff had loss of circulation; (2) $63.44, covering trucking traveling block and hook to Ott No. 1 Well; (3) $50.56, covering trucking charges; or a total of $1,151. Deducting this amount from the foregoing amount of $13,428.83, leaves a balance of $12,277.83, for which plaintiff should have judgment.

Findings of fact, conclusions of law and a form of judgment consistent with this opinion may be submitted within five days of this date.